In the Matter of the Application of ABRAHAM FINKEL, Petitioner, for a Certiorari Order against PHILIP J. McCOOK, a Justice of the Supreme Court of the State of New York, Respondent.

First Department, April 3, 1936.

*Terence J. McManus* of counsel [*Hugo I. Epstein* and *Edward Rohr* with him on the brief; *McManus, Ernst & Ernst*, attorneys], for the petitioner.

*Thomas E. Dewey, Deputy Assistant District Attorney,* of counsel [*William B. Herlands* and *Edward C. McLean, Deputy Assistant District Attorneys,* with him on the brief; *William C. Dodge, District Attorney,* attorney], for the respondent.

MARTIN, P. J. The petitioner has been adjudged guilty of criminal contempt of court and has been committed to the City Prison for thirty days. By stipulation it was agreed that the sufficiency of the mandate was not to be questioned. The order under review recites that in response to questions put to him before the grand jury, " the defendant answered evasively, vaguely, contradictorily, contemptuously, contumaciously and untruthfully as appears more fully from the minutes of said proceeding before the Grand Jury marked People's Exhibit I herein, and defendant was guilty of conduct and gave testimony which was contemptuous and insolent and directly tended to interrupt the proceedings of this court and to impair the respect due to its authority and was guilty of contumacious and unlawful refusal to answer legal and proper interrogatories, all of which was contrary to Sec. 750 of the Judiciary Law."

The grand jury of the Extraordinary Special and Trial Term of the Supreme Court appointed to be held in the county of New York by order of the Governor dated July 3, 1935, for the purpose of inquiring into any and all acts of racketeering, vice, organized crime or any other crime committed within the county of New York, was considering the activities of the persons in control of a certain organization known as the Metropolitan Restaurant and Cafeteria Association, the alleged commission of the crime of extortion by such persons and the alleged illegal relationship existing between that organization and certain labor unions.

The petitioner is a member of the association and is the owner of a fifty per cent interest in a cafeteria known as Empire Cafeteria, having entrances at 79 West One Hundred and Twenty-fifth street and 306 Lenox avenue, New York city. He appeared before the grand jury on five different occasions, voluntarily waiving immunity. The testimony given by him occupies over 250 pages of the printed record. The grand jury, by unanimous vote, cited him for criminal contempt of court based upon his conduct and testimony before it. The opinion of the committing justice discusses what occurred before the grand jury and the court and quotes at length from the minutes of the grand jury hearings. To set forth all the false and evasive answers upon which the commitment is based would unduly extend this opinion. They are all contained in the record.

The committing justice in his opinion referred to several instances, as follows:

" The main subject of inquiry was an expenditure of $1,500 in June, 1934, recorded in the books of the corporation, of which he was an officer and principal owner, Empire System, Inc., under the heading ' Association Dues.' He testified he paid this amount to a person known to him only by the name of ' Jack,' never before seen by him and not introduced to him by any other person, and that he did so in order to avoid ' labor trouble.' After saying that ' Jack ' told him that he ' was a man that was connected with the union ' and being asked ' What union,' he replied ' 302,' that is to say, Local 302, Cafeteria & Delicatessen Employees Union. Subsequently, however, he changed that testimony and insisted that ' Jack ' had not told him the specific union with which he was connected and that he had no knowledge as to what union the man purported to represent. He continued to maintain that he possessed no additional information whatever as to the identity of ' Jack ' or the latter's ability to provide the ' protection ' for which ' Jack ' was being paid.  *  *  *

" His testimony as to the date of the $1,500 payment is equally significant; first, that it was about June 10, 1934, next, that it might have been anywhere from June 10th to June 15th, 1934; finally reverting to June 10th. After repeated cross-examination, he was reminded that according to the books, the money used was not received by the corporation until June 13th, 1934, but still contended for an earlier payment and ended by testifying flatly that the date of June 13th in the corporate books was erroneous and purely arbitrary. * * *

" This may be regarded as typical of the attitude adopted by the defendant-witness throughout his entire examination on every subject, for example, the important one of the source of the money allegedly taken from a safe deposit box to be paid to ' Jack.' Here are the positions successively taken by the witness:

" (1) Between $1,500 and $2,000 withdrawn from the East New York Savings Bank account in 1932 or 1933, the transcript of account showing (last substantial) withdrawal of $1,975 on August 27th, 1932. This he maintained was the money placed in the safe deposit box.

" (2) On August 27th, 1932, $3,750 was allegedly paid as his part of a deal with the Irving Trust Company. This money he claims came from a Bowery Savings Bank account. The Bowery account shows a withdrawal of only $1,775 at that time, leaving $1,975 to be accounted for.

" (3) His next explanation was that the $1,975 ' probably ' came from his wife's account at the Williamsburg Savings Bank, admittedly his only other possible source of supply. However, that account shows no withdrawals in 1932.

" (4) He then said the cash allegedly in the box came from his business, but the bank account of his corporation carries a deposit of $3,750 on August 27th, 1932, and a withdrawal on the same date of $4,250, supported by the Irving Trust Company receipt (in evidence), in that amount on that day.

" (5) Again pressed as to the source of the missing $1,975, he said he must have obtained part of it from his partner, one Klugsberg, now deceased.

" His testimony on these financial matters, which was of such a nature as to permit contradiction by documentary proof, demonstrates the manner in which he retreated from evasion to evasion, from falsehood to falsehood, until finally forced to take refuge behind a dead man."

Other illustrations of contrary and evasive testimony properly found by the court as amounting to a refusal to answer legal and proper interrogatories are found in the record with respect to the following items:

(1) An entry in the books of Empire System, Inc., reflecting a payment of $100 on June 14, 1934, charged to "Cash Association Dues."

The Empire System, Inc., is a corporation of which petitioner was an officer and principal stockholder and which is the predecessor corporation to the one operating the Empire Cafeteria of which petitioner is the proprietor. As to the expenditure represented by this entry, petitioner offered three distinct explanations. The first stated that this money had been expended by him for the construction of his store. Later he said he used it to pay tips to workmen. Finally he testified that he did not know for what purpose he had used this money.

(2) Payment of $150 on June 14, 1934, recorded on the books of Empire System, Inc., as "Association Dues."

Concerning this item, the petitioner gave many different explanations, in no one of which did he admit that the payments had anything to do with an association. At the outset he said that the money was paid to him for salary and that he used a misleading heading "to fool the Government * * * on the income tax." Later he swore the money was used for miscellaneous expenses; then he claimed it was used for tips for workmen. Upon further questioning he swore that he did not know for what purpose the money had been used. His final version was that at least part of the money had been paid to a carpenter named Max.

(3) Payment of $105 on June 15, 1934, recorded in the books of Empire System, Inc., as "Association Dues."

As to this item, he began by testifying that he might have given the sum of $105 to the Metropolitan Restaurant and Cafeteria Association. At a later time he swore that this money was not paid to the association and that the entry was false. He then stated that it might represent purchases at an auction sale "in White Plains, in a bake shop."

(4) Testimony as to joining the Metropolitan Restaurant and Cafeteria Association.

The petitioner swore that he joined the Metropolitan Restaurant and Cafeteria Association merely to be a member of that organization; he did not know the association's activities; he paid the initiation fee of $250 and $5 a week dues merely as a voluntary contribution.

There are other instances of evasive answers in the record but these will suffice to illustrate the point that the record is replete with falsehoods and evasions given for the obvious purpose of supplying replies in form only and which are the equivalent of an absolute refusal to answer.

An examination of the petitioner's testimony before the grand jury and the court, which is annexed to the return, discloses that the recitals in the commitment are fully supported by the evidence.

The power to punish for criminal contempt is conferred upon our courts of record by section 750 of the Judiciary Law. The subdivision of that section applicable to the situation at bar reads as follows: " 5. Contumacious and unlawful refusal to be sworn as a witness; or, after being sworn, to answer any legal and proper interrogatory."

If the commitment is to be upheld, it is to be upheld only on the conclusion that the petitioner had refused to answer legal and proper interrogatories. The statute uses the word " refusal." This does not mean, however, that any answer no matter how improbable, inconsistent, evasive, contradictory or obviously untruthful will forestall the summary action of the court. An " answer " considered in relation to other answers of the same witness may be so absurd, deceptive and prevaricated to such an extent that it amounts to a refusal to answer. Mere lip service is not contemplated by the statute. To hold otherwise would be emphasizing form at the expense of substance. In *Matter of Rosenberg* (90 Wis. 581; 63 N. W. 1065; 64 id. 299) it was said: " Prevarication by a witness has the same effect upon the administration of justice as a refusal to answer. To the same effect it puts the witness in the position of standing out against the authority of the court, and thwarts the court in its effort and purpose of doing justice between the parties. It is contumacy. It is direct contempt of the authority of the court."

The record here discloses that the petitioner deliberately testified falsely. On his own admission he is chargeable with perjury. Although he may be subject to punishment for the commission of the crime of perjury, there is nothing to prevent the court treating the same conduct as a contempt. The distinction is very clearly illustrated in *Edwards* v. *Edwards* (87 N. J. Eq. 546, 548; 100 A. 608), where it was said: " It is a contempt and may be punished as such. It may also be punished as a crime. The one act constitutes two offenses, one against the court, the other against the State, just as an assault committed in court may be both a contempt and a crime."

In *O'Connell* v. *United States* (40 F. [2d] 201), after the appellant had been adjudged guilty of contempt by the District Court and before the appeal was heard in the Circuit Court, he was indicted for perjury for giving the testimony for which the grand jury made the presentment for contempt. Nevertheless the majority of the Circuit Court found no difficulty in upholding the commitment, although the indictment is referred to in its opinion.

It is not our intention to hold, however, that all false swearing may be punished as a contempt. Where there is an issue as to the falsity of the testimony, the conflicting evidence should not be passed on in a contempt proceeding but should be left to the criminal proceeding, where the contemner is entitled to a jury trial. Sound public policy requires that the offender should be left to the criminal law.

There is a distinction between the untruthful statement which does not clearly appear to be such from the face of the record but is uncovered only with the aid of extrinsic evidence and testimony which is so plainly inconsistent, so manifestly contradictory and so conspicuously unbelievable as to make it apparent from the face of the record itself that the witness has deliberately concealed the truth and has given answers which are replies in form only and which, in substance, are as useless as a complete refusal to answer. This distinction was considered by the Supreme Court of the United States in *Ex parte Hudgings* (249 U. S. 378). Mr. Chief Justice WHITE, delivering the opinion of the court, said:

" Whether, then, power to punish for contempt exists in every case where a court is of the opinion that a witness is committing perjury, is the test we must here apply. Because perjury is a crime defined by law and one committing it may be tried and punished does not necessarily establish that when committed in the presence of a court it may not, when exceptional conditions so justify, *be the subject-matter of a punishment for contempt.* For an application of this doctrine to perjury, see *Berkson* v. *People,* 154 Illinois 81; *In re Rosenberg,* 90 Wisconsin 581; *Stockham* v. *French,* 1 Bing. 365; and see *In re Schulman,* 177 Fed. Rep. 191; *In re Steiner,* 195 Fed. Rep. 299; *In re Ulmer,* 208 Fed. Rep. 461; *United States* v. *Appel,* 211 Fed. Rep. 495. This being true, we must ascertain what is the essential ingredient in addition to the elements constituting perjury under the general law which must be found in perjury when committed in the presence of a court to bring about the exceptional conditions justifying punishment under both. * * *

" An obstruction to the performance of judicial duty resulting from an act done in the presence of the court is, then, the characteristic upon which the power to punish for contempt must rest. This being true, it follows that the presence of that element must clearly be shown in every case where the power to punish for contempt is exerted — a principle * * * that in order to punish perjury in the presence of the court as a contempt there must be added to the essential elements of perjury under the general law the further element of obstruction to the court in the performance of its duty. As illustrative of this, see *United States* v. *Appel,*

[*supra*]. It is true that there are decided cases which treat perjury, without any other element, as adequate to sustain a punishment for contempt. But the mistake is, we think, evident, since it either overlooks or misconceives the essential characteristic of the obstructive tendency underlying the contempt power, or mistakenly attributes a necessarily inherent obstructive effect to false swearing. If the conception were true, it would follow that when a court entertained the opinion that a witness was testifying untruthfully the power would result to impose a punishment for contempt with the object or purpose of exacting from the witness a character of testimony which the court would deem to be truthful; and thus it would come to pass that a potentiality of oppression and wrong would result and the freedom of the citizen when called as a witness in a court would be gravely imperiled."

In the case of *United States* v. *Appel* (211 Fed. 495), cited with approval by the Supreme Court of the United States in the *Hudgings* case, the court defined criminal contempt in the following statement: " The power of the court to treat as a criminal contempt a persistent perjury which blocks the inquiry is settled by authority in this Circuit [citing cases]. It is indeed impossible logically to distinguish between the case of a downright refusal to testify and that of the evasion by obvious subterfuge and mere formal compliance. The rule, I think, ought to be this: If the witness' conduct shows beyond any doubt whatever that he is refusing to tell what he knows, he is in contempt of court. That conduct is, of course, beyond question when he flatly refuses to answer, but it may appear in other ways. A court, like any one else who is in earnest, ought not to be put off by transparent sham, and the mere fact that the witness gives some answer cannot be an absolute test. For instance, it could not be enough for a witness to say that he did not remember where he had slept the night before, if he was sane and sober, or that he could not tell whether he had been married more than a week. If a court is to have any power at all to compel an answer, it must surely have power to compel an answer which is not given to fob off inquiry."

It is contended that decisions in the Federal courts and other jurisdictions are not helpful because they deal with statutes no as restricted as our own. A consideration of the most recent case on the subject passed upon by the Court of Appeals (*Matter of Foster* v. *Hastings*, 263 N. Y. 311) shows that that court had in mind the distinction between the class of perjury which is commonly met with in the ordinary conduct of trials and perjury which is deliberately calculated to be obstructive and which is apparent from the witness' own testimony. In that case the

Court of Appeals affirmed an order denying a motion by the plaintiff judgment creditor for an order to punish defendant judgment debtor for contempt in giving allegedly false testimony in proceedings supplementary to execution. The fact establishing the falsity of his testimony was brought out in a separate legislative investigation. Chief Judge POUND, writing for the court, said: "While the exact question here presented has not been passed upon by this court, it would be a strained construction of the statutes defining civil contempts to include therein perjury on the part of a judgment debtor on the ground that false swearing is not to be distinguished from a refusal to testify. On the bare issue of perjury, the judgment debtor is entitled to a trial by jury under the safeguards of the criminal law. Generally speaking, false swearing does not constitute a civil contempt. No statute so provides, expressly or by reasonable implication.

" When the witness refuses to answer or when it plainly appears that the witness denies knowledge or recollection of a fact, obviously to evade an answer as to matters within his recollection, the court may refuse to aid in a mere subterfuge and may compel an answer, but ' this power must not be used to punish perjury.' (HAND, J., in *United States* v. *Appel*, 211 Fed. Rep. 495.)

" Nothing on the face of the judgment debtor's evidence indicated that it was false. Nothing suggests that it was not a *bona fide* effort to answer the questions. No exception to the general rule can be relied on."

The record before us shows a studied effort to withhold from the grand jury information within the petitioner's knowledge upon the subject-matter of the investigation, manifested by contradictions and changes in his testimony, and his denials of the evidence set forth in his own records.

The whole course of conduct resorted to by the witness disclosed a deliberate attempt to be evasive in an endeavor to defeat the investigation then in progress. His answers were flippant, false in fact and evasive. The answers were not only false and perjurious, they were answers in form only and were clearly tantamount to a refusal to answer, and they, therefore, constitute a criminal contempt of court.

The dissenting opinion stresses the fact that the power exerted by the court is a dangerous innovation. Courts have had this power from time immemorial and it has not been abused. Many writers assert that such a power is inherent in the courts. There is very little danger of an abuse of such a power especially in view of the fact that there is a complete remedy by appeal. The far-

fetched cry of safeguarding a defendant or a witness has reached the point where it is used to defeat detection and prosecution of those who violate our laws. We must realize that the time has come when we must give more attention to protecting the honest citizens.

The order of certiorari should be dismissed and the determination of the respondent confirmed.

TOWNLEY, DORE and COHN, JJ., concur; UNTERMYER, J., dissents.

UNTERMYER, J. (dissenting). In my opinion the conduct of the witness does not constitute a criminal contempt of court, even though it were conceded that his testimony was improbable in some respects and that in some respects it was false.

In this State the power to punish for criminal contempt is strictly limited by statute (Judiciary Law, § 750), which provides that a court of record may punish as a contempt certain specified acts " and no others." The only contempt with which the petitioner, with any show of reason, can be charged is the violation of subdivision 5 of section 750 of the Judiciary Law which specifies as an act of contempt " Contumacious and unlawful refusal to be sworn as a witness; or, after being sworn, to answer any legal and proper interrogatory." There is no provision which declares that the refusal of a witness " to answer truthfully " shall constitute contempt, even though, of course, it must have been realized that a false answer might be more subversive of the administration of justice, and, therefore, more " obstructive," than a refusal to answer at all. The commission of perjury has always for its object the concealment of the truth and, therefore, if, as it is contended, " obstruction " by the witness were sufficient to constitute contempt, perjury would always be thus punishable.

The Legislature, however, appears to have concluded that perjury should be prosecuted by the ordinary processes, and subject to the ancient safeguards, which are provided by the criminal law. Such is the rule established by many decisions in this State. (*Matter of Foster* v. *Hastings*, 263 N. Y. 311; *People ex rel. Falk* v. *Sheriff of New York County*, 258 id. 437; *Matter of Silberman Dairy Co.* v. *Econopouly*, 177 App. Div. 97.) Even though " decisions of other States, sustaining the right to punish for contempt, are of little value here where such right has been limited by statute " (*Matter of Foster* v. *Hastings, supra*), yet it is interesting to note that the same conclusion was expressed by the Supreme Court of the United States in *Ex Parte Hudgings* (249 U. S. 378). There were strong reasons for withholding from the court a power that might easily become the means, of which history had taught

us to beware, for exacting from a witness the answer which seems desirable and which is believed to be true. "To hold that he must stay in jail because he has given an answer ' no ' would be equivalent to ruling that he must stay there till he gives the answer ' yes.' " (*People ex rel. Falk* v. *Sheriff of New York County, supra.*) But quite apart from these considerations, it is not sufficient to assert that this summary power ought to be vested in the court. It is necessary to establish affirmatively that it has been conferred.

The provision of the statute which declares a "refusal * * * to answer" to be contempt may perhaps be extended to include instances where the answer is so frivolous upon its face that it does not constitute an answer at all. (Compare *United States* v. *Appel,* 211 Fed. 495.) To bring such a case within the statute, however, the answer must be so absurd that mere inspection makes it necessary to conclude that the witness did not intend his answer to be seriously considered. If, by way of illustration, a witness were asked where he was on the day preceding his examination here and should answer that he was at the North Pole, the court would be justified in regarding this as equivalent to a refusal to answer the question at all. But if the witness should testify that he was in an adjacent State and it should then appear, either upon cross-examination or by other proof, that he had been elsewhere, his testimony would not constitute a refusal to answer and in my opinion would not justify punishment for criminal contempt. This is not an artificial distinction. It proceeds upon the theory that ordinarily the judge presiding can determine without difficulty whether a witness has refused to answer but that the truthfulness of the answer, and especially whether its falsity is intentional, is not capable of summary determination without serious danger of injustice. For, it must be remembered that the witness frequently is not a party to the proceeding in which he has testified. Consequently, if summarily punishable for contempt, he would be deprived of the opportunity to offer by counsel of his own selection, as a matter of right and not as a matter of favor, a full explanation of apparent contradictions and of producing evidence by other witnesses which might cause an improbable story to appear less improbable. I do not perceive how this question is affected by the circumstance that the testimony of a witness is shown to be false by his own evidence, however inconclusive, rather than by other proof, however strong; nor do I find anything in the statute to warrant that distinction.

The record here discloses a situation, which to our great regret is not unusual, where the witness gave testimony which his cross-examination indicates to have been false. In consequence he

became involved in frequent contradictions. He testified to many improbabilities. But I fail to see how such testimony can be transformed into a refusal to answer any question. If this witness may be committed for criminal contempt, then we must anticipate that the same consequences will follow the trial of issues of fact in every court of record in the State whenever the judge presiding shall conclude that the testimony of a witness is not true. In my opinion this dangerous summary power was not intended to be given to the court.

The order of certiorari should, therefore, be sustained and the determination annulled.

Order of certiorari dismissed, and determination of respondent confirmed.