In the Matter of the Alleged Contempt of Court of Leo Kamell, a Witness before the Additional Grand Jury for the November, 1938, Term.

Court of General Sessions of County of New York, April 20, 1939.

Thomas E. Dewey, District Attorney [Murray I. Gurfein, Assistant District Attorney, and Eugene H. Clay, Deputy Assistant District Attorney, of counsel], for the People.

Caesar B. F. Barra, for the respondent.

KOENIG, J. This is a proceeding under subdivision 5 of section 750 of the Judiciary Law to adjudge one Leo Kamell, the respondent herein, in contempt of court for a refusal to answer legal and proper interrogatories before the November, 1938, term additional grand jury. The proceeding has been initiated on an order to show cause; the record of the proceedings and the stenographer's transcript of the witness' testimony have been submitted to the court, and copies of these papers have been served on the respondent, who appears by counsel.

In accordance with the statutory demand (Judiciary Law, § 751; Matter of Douglas v. Adel, 269 N. Y. 144, 147), a hearing was had and full opportunity afforded the witness to make a defense. No independent oral testimony was submitted on his behalf. He rests upon the grand jury proceeding and urges that the record is insufficient in law for a finding of contempt.

The grand jury, acting properly within its broad inquisitorial powers (People ex rel. Livingston v. Wyatt, 186 N. Y. 383, 391), is investigating whether the crime of conspiracy and extortion had been committed in connection with the unionization of retail vegetable and fruit stores and in connection with the trucking of fruits and vegetables in the county of New York.

The respondent is the president of Mak Fruit & Vegetable Stores, Inc., which operates a chain of markets and a wholesale business in Yonkers. Its principal purchases are made in Washington Market in this county and are carted therefrom by the corporation's trucks (twelve in number) to its warehouses and stores in Yonkers. One Max Marks is also a stockholder and officer of the corporation.

In connection with this witness (who appears to be the head of this substantial business), the grand jury was inquiring into the activities of the Retail Clerks' Union in relation to the circumstance of the signing of a contract for the unionization of the corporation's employees and the facts surrounding the subsequent withdrawal of the union from the establishments of the corporation, the motive that prompted it, and the connection between certain payments made by this witness with moneys withdrawn from corporation funds and the cessation of union activities.

The witness testified that after interference with his trucks carrying produce in this county he was impelled thereby to enter

into a contract with the Retail Clerks' Union for a period of one year. At the expiration of this contract no renewal was had thereof and the clerks resumed the status of non-union employees. He claims no effort was made by the union to effect its renewal. During the existence of the contract union dues were paid by the check-off system, whereby the corporation advanced the money and then deducted it from wages. The last entry for dues on the books of the corporation is on April 5, 1938.

It appears that on six separate occasions, between March 30, 1938, and August 17, 1938, checks totaling $3,400, and in varying amounts, were jointly drawn by Kamell and Marks. The checks were made payable to Marks, indorsed by him, and it is conceded that the proceeds thereof were received in cash by the respondent, and the transactions at his direction falsely entered in the corporate records either as purchases of merchandise in the ordinary and regular course of business or as advertising. It further appears from the testimony of the witness that his alleged characterization of the transaction as personal loans was not disclosed to the corporation or to its officers by an appropriate notation in the records until the books and records of the corporation were subpœnaed by the district attorney in connection with this investigation. The significance of these withdrawals is evident from the fact that it was on April 5, 1938, that the corporation had its last transaction with the union. It accordingly became highly important and relevant, in the ascertainment of the truth of the subject-matter under investigation, to determine the circumstances of the withdrawal of the union and the reasons therefor. Was the cessation of union activities due to legitimate, proper considerations, or was there a sinister and criminal motivation?

It is clear that the witness Kamell, as president of the corporation and the recipient of the proceeds of the checks, became an important witness. Knowledge there must have existed on his part as to the reasons, motives and dispositions of these moneys. The witness testified before the grand jury on six separate occasions, namely, January 10, January 13, January 17, January 24, January 27 and March 10, 1939. The grand jury has cited the witness for contempt on the basis of his testimony with respect to his purported explanations as to the disposition of the $1,900 in cash received by him covered by checks drawn on April sixth in the sum of $1,000; May twelfth, $225; June sixth, $225; July twenty-second, $225, and August seventeenth, $225. The specification relating to the disposition of a check in the sum of $1,500, dated March 30, 1938, was withdrawn on the return date of this proceeding. It must be borne in mind that the witness did not sign a waiver of immunity

and that he was specifically informed of the purpose of his appearance and that it was " not the purpose of this Grand Jury to make you a defendant."

The controlling principles of law governing the problem herein are now well settled. (*Matter of Finkel* v. *McCook*, 247 App. Div. 57; affd., 271 N. Y. 636.) Sworn to tell the truth before the grand jury, it became the absolute duty of the witness to painstakingly and in good faith divulge the truth of his information. An oath to give truthful testimony is not satisfied by the giving of evasive, inconsistent, fabricated and incredible responses. (*United States* v. *Appel*, 211 Fed. 495.) By such a course of conduct knowledge is concealed and in its stead is a deliberate, well-planned effort to impede and befog the search for the truth. A concocted fantastic tale, constant repetition of lack of knowledge of facts which in the nature of things one must know, is destructive of the orderly processes designed to ascertain the truth. The legal inquisitorial body is intentionally led to a blank wall by reason of a tissue of fabrications and improbabilities, and the search for light as to the true facts is frustrated. It is contumacious conduct equivalent in effect and logic to a refusal to answer at all. " An ' answer ' considered in relation to other answers of the same witness may be so absurd, deceptive and prevaricated to such an extent that it amounts to a refusal to answer. Here lip service is not contemplated by the statute. To hold otherwise would be emphasizing form at the expense of substance." (*Matter of Finkel* v. *McCook*, *supra*, at p. 62.)

A reading of the testimony compels the inference, to the exclusion of any other reasonable inference, that the respondent was evasive, contradictory, contumacious, and that his story on its face is improbable, absurd and untruthful. His purported explanations strain credulity and can be explained only on the assumption that his motive and interest was to hinder and render useless the search for the truth. In effect, he has refused to answer legal and proper interrogatories both as to specific questions and as to the subject-matters specified and set forth in the amended citation filed by the grand jury and received in evidence as Exhibit 2.

The respondent was examined on six occasions. His testimony on the same subject-matter given on different dates, when compared, establishes inconsistencies and a deliberate resort to lack of memory. Memory may be weakened by a lapse of time (especially when the subject-matter is of little moment or import to the individual), but when there is a shortness of time between the event and its narration, and lack of memory of *critical events* is resorted to, it is highly suspicious and suggestive of an intention to conceal the true facts for an ulterior motive.

It would unnecessarily lengthen this opinion to detail all the answers of the witness which merit the condemnation of the court; it is only necessary to advert to some typical instances. Without setting forth each of the seven specifications (specification 5 has been withdrawn), it may be stated that the gist of the inquiry is to require this witness to explain the disposition of certain funds and the relation of such disposition to the withdrawal of the union.

The sixth and seventh specifications refer to a check in the sum of $1,000, cashed by the witness on April 6, 1938, and four checks of $225, each dated and cashed, respectively, on May 12, June 6, July 22, and August 17, 1938.

The evidence from the records of the corporation establish that the corporation had returned to its non-union status on April 5, 1938, the date of the expiration of the union contract. When interrogated as to the precise date when the union ceased its activities, the witness was evasive. When pressed he stated it was within the last four or five months. Confronted with documentary proof, he finally admitted that it was on April fifth. Obviously, he deliberately attempted to conceal the actual date, which must have been known to him, in view of the significant fact that the first of these checks was dated April 6, 1938. The attempted concealment of the date and his motive in so doing become quite evident when one considers the inconsistent, incredible and fantastic tale advanced to account for the disposition of the proceeds of these checks.

On January 10, 1939, he stated that the $1,900 was given from time to time to a woman with whom he had had an affair. He met this unnamed woman through a flirtation on Broadway during the winter of 1937. Thereafter he continued to meet her once or twice a week for a considerable period of time; that he always met her at a corner in the evening at eight o'clock and would drive to Westchester, and upon his return about midnight would leave her at a street corner. He never went anywhere else with her and never communicated with her between appointments either by telegraph or telephone. He did not know where she lived and all that he knew of her identity was her statement that she was a married woman. After a time she told him that she was in " trouble " and required $1,000, and threatened to tell the wife of the witness about their relationship. Acting because of this threat he gave her the indicated amounts. The witness was persistent in his inability to remember the time when he paid the money. He could not even state whether it was within two months of the giving of the testimony. Finally, under persistent examina-

tion, he conceded that his recollection would be refreshed by the date of the check. His testimony with respect to the other checks is equally unsatisfactory and shows a deliberate attempt to be evasive as to the time of the payments to gloss over the relevant fact that they approximated the period when the union withdrew.

He was even more evasive with respect to the identity of the woman. During all the time of his association with her he never met any one she knew, although he admitted at first that he paid her the money at her apartment, which was somewhere on Broadway in the nineties.

" Q. You gave this $1,000 to the woman? A. Yes, sir. Q. Where did you do it? A. I was forced to it. Q. Where? A. In the woman's apartment. Q. Where was that? A. I can't tell you. Q. Why can't you? A. Because the woman is a married woman and she happened to be on the spot."

He later changed his testimony by saying it was at a friend's house and gave a different location of the premises. He could give no information as to the identity of the alleged friend.

When interrogated as to the name of the woman to whom the alleged payments were made he declined to answer, although admitting knowledge.

" Q. We ask you to whom you gave this money to so that we may verify your story or take other steps? A. I can't tell you the woman. You are asking my personal business. Q. You understand that we can't take your word for the fact that you took out $1,000, and gave it to a woman unknown? A. Not unknown to me. Q. Unknown to us. A. I can't turn around and give you the name of the woman. That would be putting me in a terrible jam."

" Q. I ask you again, the name of the woman you gave the money to? A. I can't answer that. Q. You refuse to answer? A. Not that I refuse. Q. You don't remember? A. I remember, I will never forget it. Q. You remember and you say you won't give us the name? A. That is right."

This testimony is open only to the interpretation that the witness knew the name of the woman but refused to divulge her identity. The refusal to give the name resulted in his being brought before the court by the grand jury for direction, at which time he was directed to answer because of the immunity furnished to him by the statements of the district attorney and by virtue of the provisions of section 584 of the Penal Law protecting him against self-incrimination.

On his subsequent appearance before the grand jury he stated that her name was " Dorothy " and that he did not know her

surname.  Among his varied and shifting reasons for his refusal to answer was that it would make trouble for *him* if he revealed his meretricious relations with this woman.  On another occasion the purported reason for the refusal was based upon the protection to a woman who was married.  If his reasons on January tenth for the refusal to answer as to the name of the woman were based upon his chivalrous state of mind to protect her from the consequences of her indiscretions, then, if that be true, he must have known who she was and where she lived, as there would be no need to attempt to protect a woman utterly unknown to him.  The change to the reason that he himself would be embarrassed is just as frivolous when one considers that he had already, in the secrecy of the grand jury, divulged his relations with this woman.  Added disgrace would not follow by the giving of her name at a time when he said she was not unknown to him.

One cannot accept as plausible or persuasive that an association with this woman as detailed by him should leave him devoid of knowledge of any relevant facts that might furnish a clew to her identity.  It is quite amazing that a relationship as portrayed by him should have gained him no greater knowledge than her first name.

Palpably, the resort to knowledge of her first name only is an attempt to foreclose further inquiry.  Improbabilities stamp his entire story, and the court must conclude from the record before it that the alleged woman is wholly fictitious, created by him to conceal his knowledge of the true facts concerning the disposition of these funds received by him.

It is unnecessary to discuss the evidence relating to the other specifications except to state that the conduct of the witness as hereinbefore set forth is typical.  In the final analysis, after a series of evasive and contradictory statements, the witness has consistently taken refuge in a lack of memory concerning dates and occurrences of sufficient importance that it is manifest that these assertions are nothing but misguided attempts to block further inquiry.  The court will not countenance this procedure. (*Matter of Becker* v. *Gerlich*, 72 Misc. 157.)

It is true that perjury alone is not the test as to whether a contempt is committed.  Falsity appears in an improbable, absurd and concocted story as well as in the conclusion of falsity dependent upon extrinsic evidence.  The test, as I see it, is that if the explanation or evidence given does not offend common sense and rational reasoning, but instills a doubt as to its truth or falsity, it is not contempt even though the falsity of it may be established by independent extrinsic evidence or by material facts at variance with it.  But,

on the other hand, a valid distinction is drawn with respect to perjury, evident without resort to extrinsic evidence, which on its face by its patent improbability is calculated to be obstructive of the orderly processes of the grand jury and deemed in law to be equivalent to an absolute refusal to answer. (*Matter of Foster* v. *Hastings*, 263 N. Y. 311; *Matter of Finkel* v. *McCook, supra,* at pp. 63, 65.)

One may understand the motives that prompt the conduct of this witness. The same motive has animated testimony given by other business men in inquiries into racketeering. It may consist of fear of reprisals or of pressure brought upon them to prevent injury to an alleged criminal or racketeer. The motive, while satisfactory to the witness, cannot meet with the approval of the court. The witness must make his choice, and if he chooses to falsify and obstruct justice for his personal motives, the consequences must be met by him.

After careful consideration I entertain no reasonable doubt that the witness is in criminal contempt of court. I find that he willfully has refused to answer legal and proper interrogatories on the subject-matters set forth in the grand jury certificate of the citation of contempt, as amended.