THE PEOPLE OF THE STATE OF NEW YORK ex rel. FRANK J. VALENTI, on the Petition of GILBERT S. ROSENTHAL, Appellant, against JOHN J. McCLOSKEY, as Sheriff of the City of New York, et al., Respondents.

THE PEOPLE OF THE STATE OF NEW YORK ex rel. COSTENZE P. VALENTI, on the Petition of GILBERT S. ROSENTHAL, Appellant, against JOHN J. McCLOSKEY, as Sheriff of the City of New York, et al., Respondents.

First Department, May 5, 1959.

*Gilbert S. Rosenthal (Aaron J. Jaffe* with him on the brief), for appellants.

*Eliot H. Lumbard (Nathan Skolnik, Carl A. Vergari, Arnold M. Weiss* and *Joseph Fisch* with him on the brief), for Commission of Investigation, respondent.

BREITEL, J. P. Relators, two brothers, appeal from the dismissal by Special Term of writs of habeas corpus obtained by them to secure their release from custody. Since August, 1958 they have been held in civil custody under orders of the Supreme Court issued pursuant to section 406 of the Civil Practice Act.

On November 14, 1957, in the rural town of Apalachin in Tioga County up-State New York, a group of men, numbering about 60, assembled at the home of one Joseph Barbara. They came unaccompanied by their wives or other female companions. Indeed, there were no women at the place except, perhaps, for the wife and daughter of the host, Barbara. The bulk of the men had criminal records, some short and some long. Some came from far-away, even foreign, places. Most had been involved in suspect activities at one time or another associated with, to use the vernacular terms, gambling, racketeering and narcotics. Because the State Police in the area became suspicious they entered the premises. Many of the men fled by foot or in their automobiles; the remainder were held and questioned at the troopers' barracks. A common explanation given for their presence was that they had come to visit Joseph Barbara, a sick friend.

The meeting, which received a great deal of newspaper notoriety, resulted in a number of official investigations to uncover the purpose of the assemblage. Among those investigations

was one conducted by the State Commission of Investigation.*
Seven of those who attended the meeting were brought before
the commission by subpœna, questioned, granted immunity on
their claim of constitutional privilege, and then required further
to answer on the basis of the immunity granted (Penal Law,
§ 2447). The seven persisted in their refusal to answer.

In consequence of the seven witnesses' refusal to testify the
commission applied to the Supreme Court for orders under
which the men were detained until such time as they should
answer the 26 questions first propounded to them. These orders
were the subject of a prior appeal in this court, and the orders
were sustained as valid. In the opinion of Mr. Justice BASTOW
rendered on that appeal the circumstances under which these
men were held are described in detail, as well as are the several
legal grounds asserted by them for their persistent refusal to
answer the 26 questions (*Matter of Commission of Investigation
v. Lombardozzi,* 7 A D 2d 48, affd. 5 N Y 2d 1026).

After the State Court of Appeals ruled, on March 13, 1959,
that the seven men had been properly detained, relators alone
of the seven applied to the commission for the opportunity to
answer the questions certified in the orders of detention. They
purported to answer all the questions. The commission held
their answers, however, not responsive and evasive, and, there-
fore, a noncompliance with the August, 1958 orders of the
court.

The 26 questions, in short, were designed to elicit the wit-
nesses' knowledge of Barbara, the circumstances under which
they attended the so-called Apalachin meeting, what happened
there, and any prior relationships among those who attended.
Because they are of critical significance, one of the orders in
which the questions are set forth is attached as an appendix.

Now, having purported to answer the questions, relators
contend that they should be freed from further custody.

The primary issue in the case is whether relators are entitled
to release merely because they made some answer to the per-
tinent questions. Relators contend that this is sufficient, while
the commission argues that the answers must be true, or, in
any event, at least be credible. Raised directly is the further
question whether the standards for the sufficiency of the answers
given by relators are the same under section 406 as in sum-
mary proceedings in judicial contempt. Raised, also, inci-
dentally, but nevertheless significantly, is whether in testing
the satisfactory character of the answers the commission could

---

* Created by L. 1958, ch. 989. Among its powers is the investigation of
organized crime and racketeering.

properly address questions to the witnesses other than those specifically set forth in the orders of commitment.

The problems raised by the case are difficult, as they are in all matters involving evasive contempt. For in such cases a fine distinction must be made. Every falsehood is an evasion, and every evasion, of necessity, amounts to some degree of falsehood. Nevertheless, the rule is quite clear that one who is guilty only of false swearing may not be summarily tried and committed. It is also true, however, that if false and evasive testimony is given to obstruct an inquiry and goes beyond the raising of an issue of credibility then summary sanctions are available.

On this view, relators are entitled to release only if they gave proper and responsive answers to the questions. But this does not mean that the answers must satisfy the expectations or wishes of the questioners. Nor does it mean that the answers must be demonstrably truthful; but it does mean that the answers must be more than mere lip service by the utterance of intelligible words. While the distinction is difficult, both to phrase and to apply, it will be more readily understood from the application to the facts in this case.

As will appear from the application of the appropriate rules, relator Frank J. Valenti is entitled to release on the ground that his answers to the 26 questions are not so palpably false and evasive as to be tantamount to the avoidance of giving answers. On the other hand, relator Costenze P. Valenti is not entitled to release because his purported answers are palpably false and evasive, designed to obstruct and having the effect of obstructing the inquiry and avoiding the giving of answers to the commission. As a consequence, the latter has not purged himself of the persistent defiance of the order under which he has been detained.

Needless to say, the right to detain relators depends upon the internal content of their testimony before the commission. Also, needless to say, each relator is entitled to have his separate testimony examined without reference to the testimony of the other, or to what is known from sources outside the record he has made. The latter statements are true, at least, in this kind of proceeding where the issue is noncompliance with a direction to answer, and the inquisitor's contention is based upon evasion proven by the very purported answers given.

One of the brothers, Frank, asserted that he had been taken to the meeting by his brother, Costenze, and that he had been a quite passive figure in the entire transaction. He said that

for several decades he had been a resident of Pittsburgh, Pennsylvania, and had moved only recently to Rochester, New York, where his brother Costenze lived. He said that his brother decided to take his new car for a short trip down to New York City and had asked him, Frank, to join him. They stopped at Syracuse to visit a friend named Sam Scro and stayed overnight at a motel. The next day Costenze suggested that they should drive to Apalachin to visit a sick friend of his before proceeding directly to New York City. Frank asked no particular questions about this, and Costenze provided no additional information.

According to Frank, the brothers arrived at Barbara's home in Apalachin about noon and left about 6:00 P.M. after the State Police had intruded. When they arrived there were many men. To Frank's recollection there were about 40, 30 men; there could have been 50, "tops". The guests partook of food and drink which was available on the grounds and they largely served themselves. There was only casual conversation of no particular moment. No one addressed them. That was the only time Frank had met Barbara in his life. Most of the men there he did not know but there were a few that he recalled meeting on prior occasions.

Costenze, the other brother, gave a similar story in answering the 26 questions, with this difference however: since both Frank and he had concurred that it was he who brought Frank to the meeting, he had the heavier burden to explain the happening of the event. Costenze said that he had met Barbara some four, five, six or seven years before at a beer convention at a hotel in Syracuse. He had seen him four or five times since; but he had never communicated with him by telephone or writing. He knew that Barbara had been sick — a heart condition — and thought it would be a nice thing to visit him. No one informed him of Barbara's illness and he could not recall when he had last seen him in the last two or three years. He did recall, however, that Barbara had told him at some time that he had been ill, and that he would need an operation. When he got to the Barbara home he was quite surprised by the large crowd.

As Costenze was pressed, he said there could have been 20, 25, maybe more, present; but it could have been 30, 40, 50, 60; but he did not know whether there were 100. He did not ask Barbara what was the occasion for the meeting and, therefore, evidently, it did not strike him that his coming without notice or invitation was any kind of intrusion. He knew quite a number of the people who were there but not all of them. There

was only casual conversation, no formal meeting, and no one formally addressed them. They had arrived about noon and stayed until about 6:00 P.M., when the State Troopers arrived. He confirmed his brother's story about taking his new automobile for a short trip to New York City, the stopping off to see Sam Scro at Syracuse, the staying overnight at a motel, and his suggestion to Frank that they stop off and visit his sick friend, Barbara.

These were the answers which these men had withheld for some seven months while they remained in custody and their legal rights were being tested.

The commission is of the view that these answers are false. Apart from the inherent improbability of the answers, the commission also relies on the many evasive and palpably false answers given by the brothers to many other questions asked of them when they submitted to questioning to obtain their release.

So as to make the issue quite clear, it may be assumed that the answers supplied by these men to the 26 questions were highly improbable, even ludicrous and incongruous, but nevertheless the rule to be applied is not whether the answers are false but whether they are obstructive to the inquiry and palpably false and evasive of the obligation to answer.* In order to derive the rule one must first determine the scope of the statute under which these men have been held. Section 406, in pertinent part, reads as follows:

" 1. When a judge, or an arbitrator, referee or other person, or a board or committee, has been heretofore or is hereafter expressly authorized by law to hear, try or determine a matter, or to do any other act in an official capacity, in relation to which proof may be taken, or the attendance of a person as a witness may be required; or to require a person to attend, either before him or it, or before another judge, or officer, or a person designated in a commission issued by a court of another state or country, to give testimony, or to have his deposition taken, or to be examined; a subpoena may be issued by and under the hand of the judge, arbitrator, referee or other person, or the chairman or a majority of the board or committee, requiring the person to attend; and also, in a proper case, to bring with him a book or a paper. The subpoena must be served in the

---

* The terminology used in describing this distinction is hardly satisfactory, but it is found in the cases. "Incredible" would seem in this context to mean what is not believed, or would not be believed by any, as a matter of probability. On the other hand, the "palpably false" would seem to be that which no reasonable person could believe.

same manner as prescribed for the service of a subpœna issued out of a court of record. This section does not apply to a matter arising, or an .act to be done, in an action in a court of record.

" 2.  *  *  *

" 3. If the person subpœnaed and attending or brought as prescribed in the last subdivision before an officer or other person or a body refuses without reasonable cause to be examined, or to answer a legal and pertinent question, or to produce a book or paper which he was directed to bring by the terms of the subpœna, or to subscribe his deposition after it has been correctly reduced to writing, the person issuing the subpœna, if he is a judge of a court of record, or not of record, may forthwith, or if he is not, then any judge of such court may upon proof by affidavit of the facts, by warrant commit the offender to jail, there to remain until he submits to do the act which he was so required to do or is discharged according to law.

" 4. A warrant of commitment, issued as prescribed in the last subdivision, must specify particularly the cause of the commitment; and, if the witness is committed for refusing to answer a question, the question must be inserted in the warrant.

" 5.  *  *  *."

The statute is one with a very long history (see, e.g., 2 Rev. Stat. of N. Y. [1829], pp. 278, 401; *Matter of Barnes*, 204 N. Y. 108). For example, it once embraced proceedings for legislative contempt, as well as contempt before nonjudicial bodies, judges as distinguished from courts, other official but nonjudicial persons, and before courts not of record (Code Civ. Pro., § 854, as amd. by L. 1900, ch. 587). It has always been a counterpart to the other provisions of law which provide direct compulsion for the giving of evidence in courts of record (Judiciary Law, § 750 *et seq.*).

Unlike the statutes governing judicial contempt, which restrict the sanctions to limited periods of confinement and fines, this statute permits the indefinite detention of recalcitrant witnesses until they have complied with the order of the court. Also, unlike the sanctions for summary judicial contempt, which are enforced by the very courts whose mandates have been violated or resisted, the sanctions under section 406 must be obtained from the courts by the agency which seeks to use compulsion.

Section 406, therefore, is not an alternative to proceedings in judicial contempt but a counterpart proceeding available to agencies which themselves are not empowered to impose direct sanctions to compel the giving of evidence. (See, 6 Carmody-Wait, New York Practice, p. 372 *et seq.*; Vol. 21, p. 157 *et*

*seq.*) Nor does the section provide an alternative to prosecution for the crime of contempt, which is also limited to contempt in judicial proceedings (Penal Law, § 600). Of course, once an order is made under section 406 directing the witness, in effect, to answer, he is then confronted with a mandate of the court, which, like any other, must be obeyed, and presumably all the sanctions available to enforce the judicial mandate ensue, whether summary or plenary. Since it will be necessary to distinguish between contempt and perjury, it should be noted that the statutes providing for prosecution for the crime of perjury (Penal Law, § 1620 *et seq.*) apply to all false swearing, where the taking of an oath is authorized, whether before judicial bodies or nonjudicial bodies.

Because section 406 provides a counterpart proceeding to judicial contempt, and this has been true almost throughout the history of the State, it performs the same function for the compulsion of testimony as do the statutes imposing sanctions for judicial contempt. This it does despite the fact that the sanctions are not exactly alike. Thus, if relators had answered evasively, instead of refusing to answer at all, when they were first questioned by the commission, it would seem that summary relief under section 406 would have been available. On this view, the scope for compulsion and the standard for whether the compulsion has been satisfied is the same, whether applied in cases arising in judicial contempt or under section 406.

Moreover, as already observed, once an order issues under section 406, there is, in effect, a mandate by the court to give the evidence described therein. Further disobedience is no less than a contempt of that court order. But it is also no more. This becomes very significant in this case because one is no longer concerned only with recalcitrance before the commission, but also with defiance or evasion of the order of the court. Nor is it of any moment that the detention orders preceded the giving of the answers, for the key is that an evasive answer is no answer. Hence, an evasive answer does not satisfy the detention order. If anything, it is a more flagrant and brazen defiance of the order of the court.

Consequently, the rules developed in relation to the distinction between the merely false answer and the evasive one in the field of judicial contempt are wholly applicable to proceedings arising under section 406. Thus, where a witness gives an explanation but it is an incredible one the sanction is by prosecution for perjury or the crime of contempt, and not by summary contempt. (*Matter of Foster* v. *Hastings*, 263 N. Y. 311; *People ex rel. Falk* v. *Sheriff of N. Y. County*, 258 N. Y. 437; *Blim* v.

*United States,* 68 F. 2d 484; *Matter of Steingut* v. *Imrie,* 270 App. Div. 34, revg. *sub nom. Matter of Parsons* v. *Steingut,* 185 Misc. 323; *People* v. *Finkelstein,* 202 Misc. 1080; *cf. People* v. *Saperstein,* 2 N Y 2d 210, 216–217.) But where the answers are purely evasive in that they deny knowledge or recollection of that which must be known or recalled, or are so false as to offer not the slightest probability of truthfulness, then the summary sanction may be applied on the ground that although the witness has uttered words he, in fact, has given no answers (*Matter of Finkel* v. *McCook,* 247 App. Div. 57, affd. 271 N. Y. 636; *Clark* v. *United States,* 289 U. S. 1, 10 *et seq.*; *United States* v. *McGovern,* 60 F. 2d 880; *United States* v. *Appel,* 211 F. 495; *People* v. *De Feo,* 284 App. Div. 622, 625, revd. on other grounds 308 N. Y. 595; cf. *Nilva* v. *United States,* 227 F. 2d 74, 79, mod., however, 352 U. S. 385, 391; cf. Ann. Perjury or False Swearing as Contempt, 11 A. L. R. 342, 73 A. L. R. 817; 17 C. J. S., Contempt, § 24).

So that confusion not be engendered, it must be noted that in summary contempt, at least for criminal contempt, the general rule requires that guilt must be established beyond a reasonable doubt (see *People* v. *Shapolsky,* 8 A D 2d 122 *; *Matter of Wegman's Sons,* 40 App. Div. 632, 633; *Matter of Phillips,* 207 Misc. 205; and in the Federal courts, e.g., *United States* v. *Patterson,* 219 F. 2d 659, 662; *United States* v. *Dachis,* 36 F. 2d 601, 603, *infra*). However, in contrast to a prosecution for the crime of contempt or perjury, in which there is a right to a plenary trial and the safeguards associated with such trial, in summary criminal contempt depending only upon the internal content of the questioned testimony the issue of credibility is sufficient to create a reasonable doubt (*Matter of Finkel* v. *McCook, supra*; *United States* v. *Appel, supra*; *People* v. *De Feo, supra*; *People* v. *Finkelstein, supra*; *Matter of Kammell* v. *Koenig,* 170 Misc. 868, affd. 258 App. Div. 723). Thus, in the *Finkel* case (247 App. Div. 57, 63, *supra*) it was emphasized that "There is a distinction between the untruthful statement which does not clearly appear to be such from the face of the record but is uncovered only with the aid of extrinsic evidence and testimony which is so plainly inconsistent, so manifestly contradictory and so conspicuously unbelievable as to make it apparent from the face of the record itself that the witness has deliberately concealed the truth and has given answers which are replies in form only and which, in substance, are as useless as a complete refusal to answer." So, too, in the *Appel* case, Judge LEARNED HAND said that the rule ought to be: "If the witness' conduct shows beyond any doubt whatever that he is

---
* Decided May 12, 1959.

refusing to tell what he knows, he is in contempt of court." Nevertheless there is little question that what is involved is no more than a species of the reasonable doubt rule applied in summary criminal contempt, except that from the character of the proof, — namely, the testimony of the allegedly evasive witness alone — an issue of credibility is sufficient to create a "reasonable doubt". This, at any rate, the cases uniformly hold in the absence of a hearing buttressed by extrinsic proof of falsity or a plenary trial for the crime of contempt or perjury.

On the analysis made thus far, if Frank and Costenze gave only false answers, even incredible ones — but short of palpably false and obstructively evasive ones — they have satisfied the statute and the orders under which they were committed, and they must be released. For if there is any issue of credibility then it is one which can only be resolved in a criminal prosecution for perjury or for the crime of contempt, and not in a summary proceeding. On the other hand, since the theory of the evasive answer is that it is not an answer, if either Frank or Costenze have obstructed the inquiry and by evasive maneuver avoided giving information, they have failed to comply with the orders of commitment and to purge themselves of the contempt involved. It is, of course, for the court, as the commission concedes, to determine whether the answers supplied create an issue of credibility or whether they are so false and preposterous as to preclude the raising of any issue of fact. (*Howard* v. *United States*, 182 F. 2d 908, revd. on other grounds 340 U. S. 898; *Clark* v. *United States*, 289 U. S. 1; *Matter of Michael*, 326 U. S. 224, revg. 146 F. 2d 627 [per Goodrich, J.] in which, however, the rule is discussed and the authorities collected; *Ex Parte Hudgings*, 249 U. S. 378.)

Before considering how the testimony of Frank and Costenze meet these tests it is necessary to discuss one of the incidental issues raised. That issue is whether the commission was limited to asking only the 26 questions embraced in the orders of commitment. Logically, it must be that they are not so confined. In fairness to the witness and to the commission, it was entitled to explore the immediate answer given to any specific question. (Cf. *People* v. *Saperstein*, 2 N Y 2d 210, 217, *supra*.)

No words are so clear or so exact that only one meaning can be attached to them, in the mind either of the speaker or the hearer. Moreover, there must be opportunity to make correction of innocent and obvious error. Thus, even when a man is asked his name and he answers with a name other than the one that the commission believes he has, they may explore that fact

and see whether further interrogation will vary the answer. Or, in more complicated matters, such as whether the witness knew Joseph Barbara, the commission was entitled to ask directly related questions to test the scope of the denial or the affirmation of such knowledge.

But on equally logical grounds it is also clear that the commission could not explore matters not directly related to the 26 questions in order to establish general improbability or evasiveness with regard to the witness' credibility. To permit such extended inquiry while the witness is under a commitment would mean that a witness' release could be indefinitely postponed by collateral issues and even litigation, although he had already purged himself of the contempt involved in refusing to answer the questions for which he had been committed. If, on the other hand, it were to be argued that the extended collateral questioning was required in order to assess generally the truth of the answers given to the 26 questions, then the argument, under the rules, defeats itself. For it would thus become patent that a sharp issue of credibility had been raised and further summary detention would not be permitted.* The further recourse would be prosecution for perjury or for the crime of contempt, although such alternatives involve obvious practical difficulties.

Finally, it is possible to consider and evaluate the answers given by these two men to the 26 questions. It should be readily apparent, on the discussion thus far, that Frank's story is not one that it so patently obstructive and evasive as to raise no issue of fact. It could be that he had no knowledge of his own as to the nature and purpose of the meeting. It could be, although it is most difficult to believe, that he and Costenze did not discuss more of the meeting than both said they did while they drove from Rochester and then detoured from Syracuse to Apalachin. Hence, these involve issues of credibility which even the court may not summarily determine, solely on the challenged testimony of the witness.

On the other hand, the testimony of Costenze, who took upon himself the responsibility for explaining the presence of himself

---

* But, see, *United States* v. *Dachis*, 36 F. 2d 601; *United States* v. *Karns*, 27 F. 2d 453; *Haimsohn* v. *United States*, 2 F. 2d 441. It is quite evident that the Federal practice may go further than that in this State, at least for the present. It is this divergence in practice which explains Special Term's denial of the commission's request for a hearing. Of course, even in this State there may be situations where a false swearer may be confronted with such indisputable proof on a hearing as to expose him to summary sanction; but that situation cannot arise where the evasion depends upon the internal content of his answers to questions.

and his brother at Apalachin satisfies the summary test required for finding the testimony to be obstructive and evasive. It was he who, without prior notice and invitation, took it upon himself to bring himself and his brother to visit a " sick friend " in Apalachin. His only knowledge of Barbara's illness is some conversation he had with Barbara years before. Even this explanation was not given immediately.

First, Costenze said he knew that Barbara was ill and had had an operation. Then, when he was pressed as to how he knew this, and he could not identify anyone or any means by which he had been so informed, he finally said that Barbara had so told him when he had last seen him. At the same time he could not fix the time when this occurred or place the occasion. Despite the fact that he came to a private home and grounds filled with people he made not the slightest effort to find out whether his presence was an intrusion. His estimates of the number of persons present at Apalachin were so extreme in the limits he imposed that he obviously was making no attempt to give any kind of answer. This was truly the example of the evasive maneuver which is designed not to disclose and yet seeks to evade the penalties of falsehood. It is also typical of the evasive answer in seeking to avoid particularity which might become the foundations for further questions or exposure.

It is not merely, therefore, that the commission had foisted upon it a tale of a quite remarkable coincidence, namely, that Costenze and his brother, purporting to visit a " sick friend ", arrived at an all-male meeting, in a rural private home, with an unusually large attendance of persons with criminal records; but that he also denies asking of his host every one of the obvious questions which an unexpected guest must have asked, or if not, must have beaten an immediate retreat. In so viewing Costenze's testimony, his absurd claims that he could not read road maps (despite the fact that he has been driving for many years, and drove his automobile on this occasion) may be disregarded. So, too, his absurd claim of not recalling the route that he took to drive from Syracuse to Apalachin may be disregarded, although it suggests that he was guided to Apalachin. Nevertheless, while any one of the latter answers could have been true, it surely exhausts credulity that all of them could have been true.

In making this analysis of his testimony, as in making the analysis of the testimony of Frank, the many bold evasions both practiced with regard to questions not directly related to the 26 questions included in the orders of commitment, have

been, as they must be, disregarded. Particularly egregious were the disclaimers by both that they had not discussed their testimony with each other or with any of the seven while in the civil jail, even in connection with their most recent appearance.

Of course, these proceedings need not be the end of the matter. Presently the court is concerned only with the summary detention of these two men for refusing to answer the 26 questions. All that is now involved is their purported answers to these questions. Should the inquiry proceed further they are bound as witnesses to testify and they may incur the various sanctions imposable for false swearing or evasive obstruction of the inquiry. Theirs is the choice and the risk as to what may further ensue. Moreover, the same limitations discussed would not necessarily apply to a prosecution for the crime of contempt, or even to that more difficult remedy of prosecution for the crime of perjury. As the matter now stands, however, any evasions or falsehoods not directly relatable to the 26 questions cannot enlarge the certified ground on which either has been held.

Accordingly, the order of Special Term dismissing the writ of habeas corpus with respect to relator-appellant Frank J. Valenti should be reversed, on the law and on the facts, and the petition granted, and the order of Special Term with respect to relator-appellant Costenze P. Valenti dismissing the writ of habeas corpus should be affirmed, on the law and on the facts.

M. M. FRANK, VALENTE, McNALLY and STEVENS, JJ., concur.

Order dismissing the writ of habeas corpus with respect to relator-appellant, Frank J. Valenti, unanimously reversed, on the law and on the facts, and the petition granted, without costs.

Order dismissing the writ of habeas corpus with respect to relator-appellant, Costenze P. Valenti, unanimously affirmed, on the law and on the facts, without costs.

Settle orders.

APPENDIX

## ORDER DIRECTING THE ISSUANCE OF A WARRANT OF COMMITMENT (FRANK J. VALENTI)

At a Special Term, Part I, of the Supreme Court of the State of New York, New York County, held at the County Court House, Centre and Pearl Streets, Borough of Manhattan, New York City, on the 12th day of August, 1958.

Present: Honorable MORRIS SPECTOR, Justice.

The motion having regularly come before me to be heard on the 12th day of August, 1958, for an order under Section 406 of the Civil Practice Act directing the issuance of a warrant to the sheriff of the City of New York or to the sheriff of any other county in the State of New York wherein Frank Joseph Valenti may be found, commanding that he be arrested and committed to the jail of the county wherein he is apprehended, and upon the order to show cause granted by the Court on the 12th day of August, 1958, the affidavit of Myles J. Lane, one of the Commissioners and Chairman of the Commission of Investigation of the State of New York, verified the 12th day of August, 1958, and the papers therein referred to and thereto attached, and after hearing Eliot H. Lumbard, Chief Counsel for said Commission of Investigation, in support thereof, and Gilbert S. Rosenthal, Esq., in opposition thereto, together with a transcript of testimony before the said Commission and made an exhibit herein, and due deliberation having been had, it is

ORDERED that said motion be and the same is hereby granted in all respects, and it is further

ORDERED that a warrant issue to the sheriff, of the City of New York, or to the sheriff of any other county in the State of New York wherein respondent Frank Joseph Valenti may be found, commanding him to arrest the said Frank Joseph Valenti, and to commit him to the jail of the county wherein he is apprehended, there to remain until he answers truthfully and responsively, before the said Commission of Investigation, to wit: the following questions concerning the meeting held at the premises of Joseph Barbara at Apalachin, New York on November 13 and 14, 1957:

1. Q. Do you know Joseph Barbara of Apalachin, New York?
2. Q. Were you at the premises of Joseph Barbara in Apalachin, New York, on November 14, 1957? I show you photographs, marked Commission's Exhibits 2 and 3, of Joseph Barbara's home and premises at Apalachin, and ask you whether you recognize these premises. Have you ever been to these premises?
3. Q. During what hours were you at the premises of Joseph Barbara in Apalachin, New York, on November 14, 1957?
4. Q. Did you attend a meeting on the premises of Joseph Barbara in Apalachin, New York, on November 14, 1957?

5. Q. Who asked or directed you to go to the premises of Joseph Barbara in Apalachin, New York, on November 14, 1957?

6. Q. Did you know before you arrived who would be present at the premises of Joseph Barbara in Apalachin, New York, on November 14, 1957?

7. Q. How did you travel to the premises of Joseph Barbara in Apalachin, New York, on November 14, 1957?

8. Q. With whom did you travel to the premises of Joseph Barbara in Apalachin, New York, on November 14, 1957?

9. Q. Where did you spend the night on November 13, 1957?

10. Q. Where did you spend the night on November 14, 1957?

11. Q. At what time did you arrive at Apalachin, New York, on November 14, 1957?

12. Q. Who served the food and drinks to the persons gathered on the premises of Joseph Barbara in Apalachin, New York, on November 14, 1957?

13. Q. When were the food, drinks and other refreshments served?

14. Q. Approximately how many persons were present at premises of Joseph Barbara in Apalachin, New York, on November 14, 1957 while you were there?

15. Q. Whom did you meet at the premises of Joseph Barbara in Apalachin, New York, on November 14, 1957?

16. Q. Did you meet Joseph Barbara in Apalachin, New York, on November 14, 1957?

17. Q. Whom else did you see at the premises of Joseph Barbara in Apalachin, New York, on November 14, 1957?

18. Q. Were any public officials present at the meeting?

19. Q. With whom did you talk while on the premises of Joseph Barbara in Apalachin, New York, on November 14, 1957?

20. Q. What was discussed?

21. Q. What was the general subject of discussion at the meeting?

22. Q. Who addressed the meeting?

23. Q. Did you address the meeting?

24. Q. Have you had business dealings with anyone you met at the meeting?

25. Q. Had you previously known anyone you saw at the meeting?

26. Q. What was your purpose in going to the meeting?

or is otherwise discharged according to law.