In the Matter of Irwin Steingut, Petitioner, against Daniel F. Imrie, Justice of the Supreme Court of the State of New York, Respondent.

Third Department, November 14, 1945.

*Costello, Cooney & Fearon,* attorneys (*Theodore Kiendl, George R. Fearon, William Weisman* of counsel), for petitioner.

*Nathaniel L. Goldstein, Attorney-General,* by *Hiram C. Todd, Special Assistant Attorney-General* in charge of the Legislative Investigation (*Martin H. Weyrauch, Sherman S. Rogers* and *Lester G. Rubenstein, Special Assistant Attorneys-General,* of counsel), for respondent.

HILL, P. J. Petitioner has been adjudged guilty of criminal contempt of court, fined $250 and ordered imprisoned for ten days. He is, and has been for many years, a member of Assembly of the State of New York, representing a Brooklyn district. The justice presiding at an Extraordinary Term of the Supreme Court, convened pursuant to the authorization and direction of the Governor of the State, found contempt to have been committed. The proceeding was commenced by the affidavit of the foreman of the Grand Jury, charging a violation of section 750 of the Judiciary Law, particularly that portion thereof [subd. 5] which provides that a person is guilty of a criminal contempt for " Contumacious and unlawful refusal to be sworn as a witness; or, after being sworn, to answer any legal and proper interrogatory." It was determined by the justice that petitioner gave " vague, evasive, contradictory and contumacious answers, incredible, absurd and untruthful on their face, amounting in effect to a refusal to answer legal and proper interrogatories " and that this conduct " did in fact defeat, impede, impair and prejudice the investigation of the Grand Jury aforesaid ". The Extraordinary Grand Jury was convened by the Governor for the purpose of inquiry into and prosecution of any and all crimes committed or alleged to have been committed in the county of Albany by any member, officer, employee or agent,

or former member, officer, employee or agent of the Legislature of the State of New York, and for the purpose of conducting and handling such other proper actions, proceedings and matters thereto related as might come before the court. The title of the criminal action in which petitioner was examined was "The People of the State of New York against 'John Doe' and 'Richard Roe'".

The foreman of the Grand Jury charges contempt in connection with the answers made to two types of questions. One had to do with the claimed receipt by petitioner of $96,000 in currency from his father some twenty-five years ago. The essentials of that testimony were that the father Simon, who had a small office where he did business as a notary public, real estate agent and business broker, in a conversation with petitioner, wrote down the combination of a small office safe and said, "I have almost $100,000 there", and expressed a desire that petitioner should have it to the exclusion of Simon's divorced wife and other surviving heirs. Petitioner says that upon his father's death he found there was $96,000 in the small safe; that for a decade or more he permitted it to remain, finally transferring it to a safe deposit box in a bank, and that he loaned $60,000 thereof in 1936 to one Kalik, described in the affidavit of the foreman of the Grand Jury as a "book maker and gambler". The story of this treasure, kept in an insecure place, by one who seemed and acted like an impecunious old man, with no bank account or known accumulation, and the nondisclosure for many years by the petitioner, relegates the transaction to the age of Aesop rather than to that of Calvin Coolidge. However, the justice in his opinion dismisses this branch of the case with the statement that the testimony was "not sufficiently shown to have been false to call for the punishment of the respondent for contempt by reason thereof."

The contempt was found upon the testimony given in connection with exhibits as to financial matters, prepared by some of the accountants and investigators working under the direction of the Special Assistant Attorney-General assigned to this matter. These exhibits were taken up with petitioner at his examination in the latter days of April, and thereafter he was given a list of twenty-nine questions with the request that he furnish schedules or statements in answer to each as to his own receipts and disbursements, those of his wife and other members of his family for each of the years "from 1935 to 1944 inclusive". The information requested concerned the income of petitioner's wife for each of the years "showing the sources

of the funds and the disposition thereof ''; the source of the funds used by petitioner's wife in the purchase of '' clothing, furnishings and the like '' except where the payments were made by check; the '' amounts paid by Mr. and Mrs. Steingut and members of their immediate family for traveling expenses during said period, by railroad, steamship, airplane and otherwise, with dates, destinations and expenses incurred; all travel by boat to include name of ship and length of cruise ''; facts as to the purchase and sale of stocks and bonds by both petitioner and his wife; '' all purchases of clothing made by Mr. Steingut during said period, with date of each purchase, amount paid, the name of seller ''; the same as to Mrs. Steingut; a list of all clubs and associations of which petitioner or his immediate family were members, the date and cost of membership, and all funds expended at the clubs or associations; the amount expended in connection with the marriage of petitioner's daughter, the same as to the marriage of the son, and a list of '' all expenditures made by either Mr. or Mrs. Steingut during said period for entertainment, including amounts expended for beverages, tobacco, theatres, concerts and night clubs.'' There were requests for information as to numerous other items.

A quite substantial sum of money was appropriated for the expenses of the Extraordinary Term, and many thousands of dollars were used for accountants and research agents in the preparation of the schedules which it is claimed reflect the receipts and disbursements made by petitioner and his wife, from which the accountants assert that it appears that there was an excess of $187,920.74 of disbursements over receipts. The accountants did not include in the amount of receipts the sum which petitioner says he received from his father. Among the disbursements is an entry '' Clothing and furnishings, $67,544.02 ''. This is made up of nearly 100 items, ranging in amount from $4.02 to Oppenheim Collins, to $10,354.39 to Belle Lenert. Accounts in excess of $1,000 are: Bonwit Teller, J. Cashmore Furniture Co., D'Andrea Bros., Henry Fuldner & Son, Inc., Kohmer & Marcus, Inc., Martha Levine, Martins, Milgrim, J. Pearlman, Russeks Fifth Avenue, Saks Fifth Avenue, Jay Thorpe and B. Weinstein. Among the larger items of disbursements are '' Checks to individuals $10,084.32 '', '' Bad debts, $3,089.56 '', '' Food and household expenses, $36,000 '', '' Hotels, $14,821.46 '', '' Travel, $4,403.82 ''. These, with many others, amount to $461,833.91.

Receipts of $273,913.17 are shown. These are described as being from business, $81,357.21; from rentals, investments and

the collection of the Max Kalik note (this $60,000 is also carried as a disbursement) $91,842.41; wagering gains, interest on savings account, etc., $5,670.33; receipts of $95,043.22 from the State of New York, being the net salary as Assemblyman and as Constitutional delegate, reimbursement for expense and, as described in the schedule, "Lu-Lus" (net) $70,554.84. The last item is explained in petitioner's income tax report as the surplus remaining from an appropriation of $8,000 made each year by the Legislature payable to the minority leader, half for extra stenographic and clerical services, and half "in lieu" of expenses incurred while serving on the several boards, commissions and committees of which the minority leader is a member. (Cf. N. Y. Const., art. III, § 6.) The rule of morality for elected public officials credited to Governor Franklin D. Roosevelt is cited as legal authority for many of the questions asked in this proceeding. The abbreviation "Lu-Lu" is generally credited to another Governor of the State, Hon. Alfred E. Smith, who substituted that euphonious term for the "in lieu of" appropriation made to several legislative officials. The above computation shows disbursements, in excess of receipts, of $187,920.74. The twenty-nine questions earlier mentioned and a considerable portion of the examination was devoted to this excess. The following are examples: "Q. Did you furnish the cash to buy the emerald-cut diamond ring which is appraised by the insurance company at $5000? A. Did I? I may have, in part. I don't know. When was it purchased, Mr. Todd? Q. That is what I was going to ask you. A. I don't know. It is very possible I may have. Q. Your wife has such a ring? A. As a matter of fact, when you speak of this ring, we were married — we are married 31 years, and over the years my wife kept changing her ring into a larger and then a larger one, so when you speak of a $5000 purchase, as such, that may have been the value of the ring at the time, but there was probably some ring given in exchange. Q. I understand this is the engagement ring that you presented to your wife, which has grown through the years? A. The original ring that I presented to my wife I paid about $500 for, and on and off she kept changing it."

And on another subject —

"Q. Are you able also to remember hotels where you have stopped? A. Some, yes. Q. You were asked for that information. You haven't furnished it to the attorney general, have you? A. Because I am not in a position to give a full answer to that kind of question. Q. You haven't given any information

on that subject, have you? A. Because my information wouldn't be complete, and I am not going to give any information unless it is complete and truthful, truthful; anything I say here or anything I state here must be the truth, nothing but the truth, because I am under oath and I am not going to permit myself to guess, enter into any guessing contest with you or this grand jury."

Upon being asked the source of $3,366 asserted to have been paid for a mink coat, petitioner says that he is unable to state the source of that money, it may have come in part from Mrs. Steingut's mother. He explains another item: "You have an item in there, Mr. Todd, as an illustration, you have charged me in this accounting that you have made up for the wedding of my daughter, which took place some years ago. Now, for your information, Mr. Todd, that wedding, the cost of it, was participated in by three people; my mother-in-law who insisted that since this was her first grandchild who was being married that she wanted to give the wedding, second the mother-in-law or at least the mother of my son-in-law, and yet I am being charged with that." Petitioner testified during this examination that his wife was ill, but he furnished many details as to her financial situation, and the Attorney-General had access to the petitioner's safe deposit vault for the purposes of an inventory.

If it were to be determined that the petitioner gave untrue testimony, that would not be sufficient to sustain this order. Perjury is triable before a jury, the person charged being protected by all the safeguards of the criminal law (*Matter of Foster* v. *Hastings*, 263 N. Y. 311). Contempt of court arises only where the failure or refusal to give testimony obstructs the court in the performance of its assigned function. Authorities upon that subject have been discussed fully and enumerated in *Matter of Finkel* v. *McCook* (247 App. Div. 57) which was affirmed without opinion by the Court of Appeals (271 N. Y. 636). The business of this Grand Jury was to ascertain if crime had been committed in the county of Albany by any legislator or former legislator. Information is not given as to the crime of which petitioner was suspected and concerning which his examination was directed. We may imagine that there was a theory that he had received a bribe and had voted in a manner requested by the bribe-giver. Thus, when he was examined as to payments made to Bonwit Teller, it was hoped to ascertain that the money came from a bribe-giver. No intimation is given as to what interests the entirely suppositious

and unidentified bribe-giver may have represented. Nowhere in the examination is the petitioner charged with an improper vote as Assemblyman. This examination seems a general fishing expedition, to find someone who had paid petitioner money, for which it could be claimed he gave a *quid pro quo* by a vote in the Legislature. Assuming the relevancy of the testimony given by petitioner in the matter of Simon earlier mentioned, or as to the amount he paid for or toward his wife's mink coat, or as to the value of her diamond ring, if the answers which he gave were untrue, a prosecution for perjury will lie. As to the relevancy, some of the questions seem far afield.

The petitioner retained an expert accountant and made a reasonable effort to give information as to the minute details of his living and other expenses over a period of ten years. The State expended quite a portion of the $250,000 appropriated for this matter upon investigators and accountants. Petitioner seems to have been the chief subject of examination. To avoid a charge of obstructing the course of justice, he was not required to match the State's expenditures.

The case should not be decided upon the issue that the Justice failed to detail the questions and answers which constituted the contempt. Petitioner answered the questions with reasonable accuracy, and in no wise obstructed the investigation before the Extraordinary Grand Jury. I favor a reversal of the order and a dismissal of the proceeding.

HEFFERNAN, J. The facts in this proceeding have been fully discussed in the opinions of two of my associates. To avoid repetition I shall only refer to them insofar as is necessary to state the reasons for my vote.

Appellant has been adjudged guilty of criminal contempt of court, a crime which must be established by proof beyond a reasonable doubt. The application to punish appellant was initiated by the foreman of the Grand Jury conducting the investigation.

The statute (Judiciary Law, § 750) provides that a court of record may punish for a criminal contempt where a person is guilty of any of the acts, and no others, enumerated in subdivisions 1 to 8 of that section and that " the particular circumstances of his offense must be set forth in the mandate of commitment " (Judiciary Law, § 752).

The charge against appellant is that he is guilty of violating subdivision 5 of section 750 in that after being sworn as a witness he refused to answer legal and proper interrogatories.

The mandate of commitment recites that appellant while appearing as a witness before the Grand Jury " gave vague, evasive, contradictory and contumacious answers, incredible, absurd and untruthful on their face, amounting in effect to a refusal to answer legal and proper interrogatories ".

I concur in the opinion of Mr. Justice BREWSTER that the mandate of commitment is fatally defective for the reasons which he assigns. It seems to me, however, that we may rest our decision on much broader grounds.

From my study of the record I am convinced that at no time did appellant refuse to answer relevant questions propounded to him. In fact the following excerpt from the opinion of the court below clearly indicates that his guilt was not based on such a conclusion. Said the court: " It is not so much the failure to answer specific questions which must be the basis of my determination, but rather a consideration of the whole text of the examination and a consideration of .' answers ' in relation to each other." [185 Misc. 323, 327.]

Appellant was interrogated as to expenditures by himself, his wife and his children for a period of ten years prior to the inquisition. He was confronted with reports, assembled by the prosecutor's investigators, as to his receipts and expenditures and those of his family, the accuracy of which was never established, and asked to say whether they were true or false. He protested again and again that he could not explain these reports until he had an opportunity to investigate their accuracy. The voluminous papers concerning which appellant was ·questioned were prepared by three accountants employed by the prosecutor who devoted four months to their preparation. It is asserted that appellant during the ten-year period expended moneys largely in excess of his income. In its opinion the court below said that appellant " was confronted with statements of such receipts and expenditures and asked to explain the sources of the funds for such excess." I believe the court inadvertently made that statement. The uncontradicted evidence is that appellant was confronted not with legal proof but merely with hearsay statements, insinuations and conclusions of the prosecutor.

Apparently appellant was convicted not because of any violation of the Judiciary Law but for a violation of some rule of public policy. Again quoting from the opinion of the court below the learned justice said: " The application of such a rule of public policy makes it relatively unimportant whether or not there is before me sound proof of the correctness of the

items or totals of the figures of disbursements." [185 Misc. 328.]

The record discloses that on May 31, 1945, the prosecutor handed appellant a letter, being exhibit No. 1151, by the terms of which he was required to give information as to twenty-nine separate items relating to receipts, expenditures and activities of himself, his wife and members of their immediate families for " each of the years from 1935 to 1944, inclusive ".

On July 18th following appellant was again summoned before the Grand Jury and was again interrogated as to information demanded in the letter. He never refused to furnish the information required. His answers and reasons for his inability to comply with the demands made upon him by this letter are illustrated by the following questions and answers: " Q. Is this grand jury to understand that you have furnished all the information that you are able in response to the requests contained in this Exhibit No. 1151? A. Well, no, that is not exactly so, Mr. Todd. If I had the time given to me, and the facilities and the money with which to employ outside people, I might be able to give you a better picture of this situation. Mr. Todd, I didn't have the facilities that you have, I didn't have investigators and accountants that can go around for me. I can't remember some of these incidents that took place over the last ten years, * * *. Q. It is your position, then, as we understand it, that it is humanly impossible for you to furnish the information or any information requested? A. Not to give you any information, no, to give you these details as you would want me to."

There is no evidence in the record that appellant gave false testimony and apparently no such claim is made.

He could not be compelled to explain something which he did not concede to be true, or which was not established clearly by competent evidence. Otherwise there would be cast upon him a burden of proof concerning a disputed matter, a burden which no defendant in a criminal inquiry is obliged to assume.

The rule enunciated by Mr. Roosevelt in the Farley removal case, however excellent as a standard for official morals, has no application whatever in a criminal matter. In that removal proceeding Mr. Roosevelt was responsible only to his own conscience, and could apply a rule which cast the burden on the officer involved. But that is not the case here. The Grand Jury had no removal power, and was bound by the rules of criminal procedure. Within those rules it could only compel the petitioner to answer a proper and legal interrogatory.

In my opinion appellant has been adjudged guilty of criminal contempt and sentenced to prison and also fined not because he violated any law of the land but because he failed "to successfully attack the credibility" of a report based on hearsay, conjecture and rumor. A citizen should not be deprived of his liberty or his property on such unwarranted accusations unsupported as they are by legal proof of guilt. To permit such a judgment to stand would be a gross injustice to appellant and a grave reflection on our system of jurisprudence.

The determination of respondent should be annulled and the mandate of commitment vacated.

BREWSTER, J. By the final order under review, petitioner, a Member of Assembly, has been adjudged guilty of a criminal contempt of court and sentenced to fine and imprisonment. The adjudication is that petitioner's conduct as a witness before the Grand Jury of an Extraordinary Trial and Special Term of the Supreme Court, holden at Albany, N. Y., by the order of the Governor, constituted a contumacious and unlawful refusal, after being sworn, to answer legal and proper interrogatories, as defined by subdivision 5 of section 750 of the Judiciary Law. The purpose of the Extraordinary Term was for inquiry into and prosecution of any and all crimes committed in the county of Albany by any member, officer, employee or agent of the Legislature of the State of New York and of conducting and handling such other proper actions, proceedings and matters relating thereto as might come before the court.

A question is presented as to whether the order under review validly complies with the requirements of section 752 of the Judiciary Law which requires in such a case that " the particular circumstances " of the offense " must be set forth in the mandate of commitment." It is clear that this requirement applies to the final order which adjudges the commission of the offense and the pronouncement of punishment therefor, as well as to any warrant of commitment which may be issued thereunder. (*Briddon* v. *Briddon,* 229 N. Y. 452; *Pawolowski* v. *City of Schenectady,* 217 N. Y. 117; *Roncoroni* v. *Gross,* 92 App. Div. 366.) How else could a warrant of attachment or commitment, should its issuance be necessary, comply with the requirements except that it followed the requisite recitals in the order? Such order has been styled a " mandate order," (*Briddon* v. *Briddon, supra,* 459) and also the " formal mandate or judgment," (*People ex rel Barnes* v. *Court of Sessions,* 147 N. Y. 290, 296), and it is such final order which is on review before us. The

rationale of the requirement is evident. It has been explained and termed salutary (*People ex rel. Barnes* v. *Court of Sessions, supra*), and a failure of compliance with it held to render the order " totally defective." (*Matter of Douglas* v. *Adel,* 269 N. Y. 144, 147.) The method and manner of the compliance has been declared. It has been determined to call for more than a " mere conclusion " or " the statement of a bare fact "; that while facts must be stated, there must be something more than " slenderest outline." (*Matter of Waldman* v. *Churchill,* 262 N. Y. 247, 252.) See, also, *Matter of Gordon* v. *Feldberg* (149 App. Div. 246) where the charge against the witness was that in answering questions put to him he disclaimed knowledge or recollection of the matters covered by the questions, and the mandate of commitment stated that such testimony showed " a willful and deliberate attempt to frustrate the purposes of the examination and to prevent the ascertainment of the truth," and that it appeared that the witness willfully evaded the questions, etc. There, the contempt order was reversed as fatally defective in that it did not " contain any adjudication as to the specific facts which the county judge deemed to be a contempt of court," and thus that the particular circumstances were not adjudged but only " a general description of the court's impression of the whole examination of the judgment debtor."

It is in the light of the foregoing rules that we must test the provisions of the order under review, which follow:

" ORDERED AND ADJUDGED that the said Irwin Steingut gave vague, evasive, contradictory and contumacious answers, incredible, absurd and untruthful on their face, amounting in effect to a refusal to answer legal and proper interrogatories, as appears more fully from the minutes of said Grand Jury marked Exhibits ' B ' and ' C ' and more particularly with respect to the subjects specified in the affidavit of John G. Parsons, Foreman of said Grand Jury, as follows:

" 1. The manner in which Irwin Steingut testified concerning an alleged excess of expenditures by himself and his wife above known and admitted income and receipts during the past ten years amounting to approximately $184,000 or a sum nearly as great as the known receipts as shown by Grand Jury Exhibits Nos. 1125 and 1144; and

" 2. Irwin Steingut's wilful failure to testify directly and responsively as to the correctness or incorrectness of the aforesaid evidentiary exhibits of the expenditures or as to a sufficient number of items or groups of items to credit or discredit said exhibits, or to explain the same, after three months' time

accorded to said Steingut to do so, which period should have been ample time for a sufficient analysis of the records upon which the sworn testimony as to the correctness of the items and the evidentiary exhibits of the expenditures were based; and

" 3. Irwin Steingut's wilful failure to make any effort whatsoever to explain the sources of funds necessary to make up the excess of expenditures specified in the complaint of the Grand Jury as set forth in the aforesaid evidentiary exhibits."

The aforesaid references to " Exhibits ' B ' and ' C ' " are: as to Exhibit B — this is a portion of petitioner's sworn testimony in answer to questions before the Grand Jury on his examinations there on April 24, April 25 and July 18, 1945; as to Exhibit C — this is a portion of the testimony of an investigator given in answer to questions addressed to him before the Grand Jury on May 23, 1945, and given in reference to " Exhibits Nos. 1125 and 1144," referred to in the order. The latter consist of tabulations of figures or schedules relating to the pecuniary income and expenditures of petitioner and his wife over a ten-year period.

We think it must be said that the *particular circumstances* of the offense or offenses adjudged by the order under review as a criminal contempt, are insufficiently set forth. Compliance with the aforesaid requirement calls for more definiteness in statement than the generality of characterization which has been applied to the petitioner's conduct, and which is " but a general description of the court's impression of the whole examination " (*Matter of Gordon* v. *Feldberg,* 149 App. Div. 246, 248, *supra*) of the petitioner therein referred to. The closest approach to a specification of the particular circumstances is described as the " *manner* " in which he testified over a wide and extended field of inquiry and to which reference is made in gross, his " *wilful failure* " to testify " *directly and responsively* " regarding the rather long and complex schedules of income and expenses also referred to in gross, and his " *wilful failure to make any effort* " to explain certain results reflected by the computations disclosed on the tabulations which had been prepared by investigators and " specified in the complaint of the Grand Jury." Since the conviction was upon the principle that petitioner had so failed in giving responsive answers to legal and proper questions that his conduct in fact and in law was tantamount to a positive refusal to answer, and which failure extended throughout a long inquiry, the difficulty of a precise and particularized description of the circumstances of his alleged offense is appreciated. However, the insufficiency of the stated generalized

characterization becomes apparent when attempt is made to identify the act or acts which may be stated to have been correctly adjudged. The court's conclusion is made to rest upon all and everything which the order refers to as having been said by petitioner in reply to questions addressed to him upon his three separate appearances before the Grand Jury. Those examinations were quite protracted. Assuredly much that petitioner said could not have made, or been used to make up, the offense. In the absence of some specification of instances as to question and answer, or series thereof, how then on review can it be known what it was which was adjudicated, or what adjudication could be interposed as a defense to subsequent prosecution? This consideration becomes important, and as such more involved, when it is noted that all of petitioner's testimony before the Grand Jury on the dates aforesaid, was not included within the adjudication which has been made, and that he was also examined before said Grand Jury on five prior occasions. And, it appears, that the ultimate objective of all of his examinations was either a single one, or else that the objective sought upon his last three examinations was one which was common to all of them. The objective was to require him to divulge the sources of his income which covered an alleged excess of his personal expenditures over known sources of income, and this over and throughout a period of ten years. It appears that, fundamentally, it was because of petitioner's recalcitrance and evasion in his replies to questions addressed to him upon that subject that he has been found guilty. This finding has been made upon the sanctioned principle that such conduct, in fact and in law, may be equivalent to a contumacious and unlawful positive refusal to answer legal and proper questions. (*Matter of Finkel* v. *McCook*, 247 App. Div. 57, affd. 271 N Y. 636.) The question then suggests itself as to whether the judgment already made would be a defense to later prosecutions based upon petitioner's conduct in answering upon the other examinations which are beyond the stated purview of the order under review.

The defect in the order is further manifested by a controversy between petitioner and his interrogator which runs pretty much throughout his examinations in question. A great deal of this had to do with the correctness of the investigator's compilation of data which formed the allegation of an excess of his expenditures over his ascertained income, and it included much colloquy between them regarding matters and things which petitioner was requested to do outside of court in order to better prepare himself to give more responsive answers to renewed question-

ing. We think it must be said that as to many of petitioner's answers which have been drawn under the blanket condemnation by his conviction, that they were truthful and were as responsive as was reasonably possible when they were given, and that as to many others, debatable ground exists and reasonable doubt arises over whether they constituted a contumacious and unlawful refusal to answer questions which were legal and proper. Merely that petitioner was un-co-operative either before the Grand Jury or in preparation outside for further questioning, this in and by itself cannot constitute the offense. There must have been a willful refusal to answer to the extent of his knowledge — to tell what he knew — in reply to legal and proper questions. (*United States* v. *Appel,* 211 F. 495; *Matter of Finkel* v. *McCook,* 247 App. Div. 57, 64, *supra.*) Willful evasion of this and . the telling of self-evident falsehoods in reply to such inquiries could be such a refusal to answer as to make it a criminal contempt. (*Matter of Finkel* v. *McCook, supra.*) However, the fatal defect in the order is again reflected when the test is made as to the quality of petitioner's answers both in contumacy and legality. Under the conviction as made patently some of the answers were not contumacious, and as to others reasonable doubt would arise whether the questions were legal and proper. This because of the admitted fact that the hypothesis upon which petitioner's excess of expenditures over income was based was supported in part by hearsay evidence. However that may be, the inquiries were so formulated and based as to at least afford reasonable doubt as to whether many of the answers condemned were the equivalent of a refusal to answer even in the light of the definition made and applied in the *Finkel* case (*supra*).

While in the argument for respondent we are pointed to specific instances where petitioner's answers appear evasive, even as to many of these the shadow of reasonable doubt seems cast upon whether they were contumacious failures on his part to tell that which he knew at the time of inquiry. We may not say that his neglect to go forth and acquire the requisite knowledge of the facts sought for by his interrogator was, under the circumstances as they are thus only generally disclosed, in itself a criminal contempt. (*Matter of Spector* v. *Allen,* 281 N. Y. 251; *Matter of Mullen* v. *Halleran,* 177 Misc. 734.) The high-minded pronouncement of a former Governor enunciated in a proceeding for the removal of one from public office, and upon which the court below seems to have placed some reliance in judging petitioner's conduct, may not serve to lessen the rigor of the defini-

tion of the statutory offense. The latter expressly excludes all conduct other than that named (*People ex rel. Munsell* v. *Oyer & Terminer*, 36 Hun 277, 280, affd. 101 N. Y. 245, 250) and consists of the violation of a *legal* and not merely a moral obligation. (*Matter of Doyle*, 257 N. Y. 244, 265–266.) Moreover, under the provisions of the order as it comes under review we are not at liberty to select the particular circumstances out of the mass which it adjudges, and judge *de novo* thereupon.

In holding as we do we are also guided and further assured by the following words of Chief Judge CARDOZO, written in the *Doyle* case (*supra*, 268), viz.: " We are not unmindful of the public interests, of the insistent hope and need that the ways of bribers and corruptionists shall be exposed to an indignant world. Commanding as those interests are, they do not supply us with a license to palter with the truth or to twist what has been written in the statutes into something else that we should like to see. Historic liberties and privileges are not to bend from day to day ' because of some accident of immediate overwhelming interest which appeals to the feelings and distorts the judgment ' (HOLMES, J., in *Northern Securities Co.* v. *United States*, 193 U. S. 197, 400), are not to change their form and content in response to the ' hydraulic pressure ' (HOLMES, J., *supra*) exerted by great causes. A community whose judges would be willing to give it whatever law might gratify the impulse of the moment would find in the end that it had paid too high a price for relieving itself of the bother of awaiting a session of the Legislature and the enactment of a statute in accordance with established forms."

The order should be annulled, without costs.

LAWRENCE, J. I concur to annul the order which adjudged the petitioner guilty of criminal contempt. The issues involved and the data pertaining to those issues have been extensively discussed in opinions of other members of the court.

Petitioner was asked to explain numerous transactions and expenditures over a long period of time. His testimony in answer to inquiries has been held to amount to a refusal to answer proper inquiries. The contempt does not seem to have been based upon false answers for which petitioner might be prosecuted but upon an alleged willful failure to testify as to the correctness or incorrectness of expenditures and a willful failure to make an effort to explain the sources of funds which would make the alleged expenditures possible.

Many inquiries were based upon information gathered by accountants employed by the prosecutor and after an exhaustive investigation. The inquiries were based upon the assumption that such information was correct. This was not conceded.

There should have been competent proof of the correctness of the data which was assumed to be correct. There should have been a more ample opportunity given to determine such correctness before criminal contempt was based upon a failure to answer definitely the interrogatories proposed.

HILL, P. J., HEFFERNAN and LAWRENCE, JJ., concur in decision with separate opinions; BREWSTER, J., votes to reverse the order and annul the determination with opinion; FOSTER, J., concurs with HEFFERNAN, J.

Determination annulled, order adjudging petitioner guilty of criminal contempt reversed on the law and facts, and the proceeding dismissed, without costs.